We'll turn to the day calendar. The clerk informs us that all counsel are ready in the cases on the calendar, so we'll begin with Utica Mutual Insurance against Clearwater. Good morning, and may it please the court. William Snead on behalf of the appellant Utica Mutual Insurance Company. There are two appeals in this case, an appeal and a cross appeal. I'd like in this session to start with the appeal, which is our appeal of the district court's ruling that the two Clearwater reinsurance contracts contain an unambiguous cap, limiting the amount it would ever have to pay to Utica, regardless of whether or not it's a mutual insurance company. What Utica pays under the policies that are reinsured. This ruling was erroneous. It was based on cases that construed and interpreted different language. There is no cap or limit language in these reinsurance contracts. The cases the district court relied upon are Belafonte, Unigard, and Excess. Each of those cases is easily distinguished because it had specific language that the court relied upon to find a cap. Belafonte was subject to the stated amount of liability. We don't have that language. Unigard was subject to the limits. We don't have that language. Excess was limits and an agreement by both sides that there were limits in the reinsurance contract. We don't have that language. What we have is a description on the front part of this certificate, which is shorthand. I think both sides agree. It's common ground that it's shorthand and it's a jargon. But it basically provides that this reinsurer accepts a piece of our umbrella policy and the rest of the certificate provides that it gets everything attributable to that piece, both loss and loss expense. That's exactly how the certificate operates. Look, I have auto insurance from farmers. If you ask me what's the limit for liability coverage under that policy, I would say $500,000. If I'm in an accident and injure someone and get sued, farmers will pay up to $500,000 to settle that case or to satisfy a judgment in that case. But it has an additional duty to defend me. And that's outside and supplemental to the $500,000 limit. If farmers were to get reinsurance of that $500,000 policy, say the top 20% of it, the top 100,000 layer over 400,000, and Clearwater were the reinsurer assuming that piece, Clearwater, under its certificate language, gets everything associated with that piece. That's all the certificate says. It gets all of the loss and all of the loss expense. It doesn't just get $100,000. Doesn't it say that upon receipt by Clearwater, I'm inserting Clearwater's name, satisfactory evidence of payment of loss for which reinsurance is provided, they'll promptly reimburse you for that, for their share of the loss, right? Correct. And does it also cover loss expense? Yes. It goes on to provide that they have a liability and an obligation for loss expense, and that's in paragraph 3G of the contract. This Court has had two of these capped cases in the last three years. In 2014, it had a case called Utica v. Munich Re. And what the Court did in that case is it found the language was different, the language governs, and it vacated a capped decision from the Northern District of New York and remanded for consideration of extrinsic evidence after which Munich Re settled. Excuse me, didn't settle. Abandoned the defense. The second case this Court had was a year ago called Global v. Century. We sent that to the New York Court of Appeals and asked them whether payment, even with or without the language in it, does the limit of liability expose them only to payment for that sum, right? Correct. Why wouldn't we wait for that panel to decide this issue, then, before we resolve your case? It's one option, Your Honor, but we say this case is like Munich and not like Global. Global had language that was identical to the Belafonte language, subject to the stated amount of liability. Right. Our certificate— There's no subject to language. Not that language, correct. Global—the contracts in Global may well be governed by whatever the Court deals with on the Belafonte issue and the excess decision from the Court of Appeals, but it doesn't necessarily govern our language. We say the proper role here for the Court, the proper approach, is to do what happened in Munich, to vacate because there is no cap, there is no language, anything like Belafonte or excess or unigard, and remand for extrinsic evidence. It is true the New York Court of Appeals has been asked—they accepted the certification, but Century, the seating company in that case, asked it to expand its consideration and to issue a broader statement of New York law. It's possible that it would have an impact here, but not necessarily—and we say the Munich decision is what should be followed in this case. The New York case—it's argued in November, I think, isn't it? November 15. We'll most likely have a decision by decision days, which will be mid-December. The Court will parse out some of its writings, and by the middle of December, we should have an answer in the New York Court of Appeals, shouldn't we? Conceivably. December, maybe January. And it could be instructive, but not necessarily—it doesn't govern, in our view, because it's different language. I would like to start with the cross-appeal, if I may, on—this is a follow-the-fortunes, follow-the-settlements issue. I think Judge Sharp made a mistake on relying on North River. I'm sorry, Your Honor. I think Judge Sharp made a mistake in relying on North River. Well, the judge's decision on the follow-the-fortunes, follow-the-settlements is correct and should be affirmed. The case starts—the arguments start with whether there is a follow-the-fortunes obligation in the Clearwater contracts. Well, of course there is. Follow-the-liability clause is in there. That's the clause that this Court held in North River v. Ace. Well, you know, yes and no, frankly. The parties conceded that there was a follow-the-fortunes obligation. They identified different language than Judge Hall, Judge Janet Hall, Chief Judge Janet Hall, in her opinion, and North River did. And so it's kind of curious to me that the Court cites a piece of language where the parties concede that there's a follow-the-fortunes obligation, and they look to the settlement language in the policy, and the opinion gratuitously uses the follow-the-liability. I have—to be honest with you, I have a hard time understanding the liability argument. The liability argument says, look, for whatever the sedent is responsible for in insuring and protecting the insured, we're responsible for. You're laying off the risk, right? Correct. Okay, that's the risk you took off. The follow-the-settlements is a different matter. The question of follow-the-settlements is, is what the sedent does in resolving the sedent's exposure. Does that bind you? Some people have said that that's inherently a part of the reinsurance relationship because it envisions efficiency with regard to the reinsurance relationship, that you accept it.  But I have a hard time seeing where the liability somehow transmutes into being bound by the settlement. If I could address that, even though my time has expired. Well, you have to ask the senator, not me. Yes. There's two points to make on that. The first is it's hard to envision reinsurance operating unless there's a follow-the-settlements, follow-the-fortunes obligation. Sure, by its very nature, don't you think? Absolutely. Why even worry about the language? Why not just impute it into that? Well, and some courts have. Right. Maybe we should. I think the court would be justified in doing so, but I don't think it needs to do so in this case. But not in your case. Well, it doesn't need to. It can. I'll tell you why. The language in this certificate, follow-the-liability, it's not just the North River VA's case. It's some esteemed commentators on reinsurance, Ostrager and Viscosal. I'm familiar with Judge Ostrager now in the New York commercial part. And Judge Viscosal in the bankruptcy court. Yeah. And their book points to this particular language and says that's a follow-the-fortunes clause. But more importantly. It's been wrong in the past. Yes, they were my adversaries over the years, and I made such arguments. This is the last point I'll make on this. How does that work out? Sometimes you win and sometimes you lose. That's right. This certificate, Clearwater, in its brief, page 23, said this contract requires us to follow Utica's liability, not its settlements. And then it's cited to some New York state court cases that said this contract doesn't mention settlements at all. It certainly does. It defines Clearwater's liability for loss, a point, Your Honor, which you raised earlier, the provision saying they owe liability for loss. And then it goes on to say loss is defined to be what Utica pays in settlements or to satisfy judgments. When you come back up, will you very briefly tell me why, even if there's an inherent follow-the-settlements rule, why you're still okay because your settlement was reasonable? I will address that in my rebuttal time. Thank you. Thank you, Your Honors. And may it please the Court, I'm David Frederick for Clearwater. And with the Court's permission, I'd like to save two minutes for rebuttal on our cross-appeal, if that would be acceptable. I'd like to start, Judge Wesley, with your question. The district court did get off course by citing North River, where it was conceded that there was a separate follow-the-settlements provision. And that altered what this court, in its explanations of the difference between follow-the-forms and follow-the-settlements, there is no follow-the-settlements provision in the Clearwater certificates. By contrast, as we note in our brief, there was a follow-the-settlements provision in the TPF&C memorandum. So the drafters of these contracts know how to make a difference if they want to. And you cannot, I don't believe, consistent with long-established reinsurance law, read a liability clause, a follow-the-form clause, to transform that into a follow-the-settlements clause. And the cases there are well established. In the New York Appellate Division, the New Hampshire case is the most recent explication of exactly this insurance language. The Clearwater certificate was at issue there, and I would refer the Court to that decision. And obviously, I asked the question, so I have a concern about that. But what about an inherent implied follow-the-settlements rule that springs from the very nature of the reinsurance relationship? You would be violating or at least changing about 180 years of common law, starting with Jet— But Jetlin's already done it in the Southern District, and he's still alive and well. Well, Justice Story, writing circuit in the 1840s, noted that the longstanding rule was that the reinsurer did not have to accept the settlement but was free to— Justice Story was writing at a time when the economy was limited to small communities. We're talking about massive reinsurance arrangements. For example, in this instance, reinsurance with regard to asbestos liability, which blossomed into a monumental issue for all kinds of carriers, like Utica and Travelers and others, when mass torts came to light with regard to exposure to asbestos and mesothelioma resulting from that. So doesn't the—I mean, the reinsurance relationship, you're riding along. You're riding along and covering the risk, right? And you're accepting that you're riding along and that the seat is in control of understanding the risk, investigating the risk, and ultimately settling the risk. Is that the case? It is the case where that is the specific relationship. Does the contract give veto power over the settlement? No, it doesn't give veto— Right, so it doesn't give you contracts. So you negotiated away the ability to control the settlement, but you get the right to second-guess it. No. You get the right to associate in the defense, provided you were given notice, which the reinsurers here were not given, and you have the right to contest what the underlying liability point is. Here you have a situation where Gould's principal argument was that there were no aggregate limits. And if that position is correct, the reinsurers are not going to face any— The position they lost in the California trial court. They lost when the Goulds switched sides because it was to its benefit to then argue to get more money from the excess insurers. They suddenly realized that they might bankrupt their carrier if they prevailed on their aggregate list, and so they decided that perhaps they'd like to have the expanded coverage that they purchased. And, of course, Clearwater wasn't a party to any of that. Judge Wesley, it may well be that there are good arguments to change the background common law rule. The parties here haven't briefed this, and I would submit this is not the appropriate time or circumstance to do that. That was my next question. Then I'll stop harassing you. No, please. No. So if you're right and we reverse and we send it back, what then happens? We— The question is then, is the settlement reasonable? Isn't it? That is correct, and there is certainly a disputed issue of fact where you have three basically incontrovertible facts here. One is that Goulds sought money from Utica in exchange for Goulds stipulating. I'm just trying to figure out if you're right on the law issue, what happens next? Well, at that point, I would submit that we would— We don't believe that's necessary because on the face of these contracts, there is no follow the settlements provision, and if that is so, then we have an opportunity to argue that there were no aggregate limits and that that issue would be litigated in the district court. Based on the fact that there has never been a proper joining of that issue where there are completely disinterested parties to argue that the Goulds policies that are at issue here did not— But we don't have to decide that. You don't have to. No, what I'm saying is that that would be the issue for the district court remand. And to our way of thinking, that's obviously a crucial issue for a substantial amount of money and that is one that should be properly litigated in light of what is a very extensive factual record that the Utica people, including the general counsel and the CEO and the board, were aware that what was going to happen was that they needed to trade this money in order to have aggregates artificially inserted into the policy limits. So in our view, a remand is completely appropriate. The summary judgment standard had not been properly done and the district court did not follow the correct standard. With respect to the primary appeal, Belafonte, Unigard, and Excess do answer the question about the limits. That principle is well established. The form that is provided in Unigard is exactly the same as it is here, and so the answer to the question of whether or not this contract has limits is one that has already been decided. Should the court decide that it wants to await the New York Court of Appeals' decision, that case will be argued on November 15th and presumably an issue will be decided shortly thereafter. What's the language in the endorsements that you say imposes the absolute limit of payment on behalf of your client? It's subject to limitations, subject to the liability limits. The word liability as defined by the Hague Treatise, which is, I believe, on page 62 in a footnote of our brief, explains that under reinsurance law that word is understood to mean a limitation of liability. Thank you. Judge Wesley, I'd like to come right to the reasonableness argument. The Utica settlement with Goulds, of course, was reasonable. As a matter of law? As a matter of law. Utica issued primary and umbrella policies. The whole structure of Goulds' insurance program was that the primaries had low limits, aggregate limits for products, and then Goulds purchased a mountain of umbrella and excess coverage, $500 million, which would have been worthless if everything stayed in the primary policy. The 78 through 82 policies where Goulds raised this aggregate issue had a scrivener's error. They had a floating number at some point and a blank at other points. When this was pointed out, Utica hired lawyers, marshaled evidence to make a case that the parties always intended to have aggregate limits. I don't recall seeing it. Was there anything that showed that the premiums were correlated to an understanding of an aggregate? The premiums, the only, that pretty much led nowhere, because the premiums weren't changing except there was a spike in 1981, which was attributable, frankly, to inflation. But this lack of aggregate supposedly started years earlier, so there was no correlation. But Utica's faced with this issue where the policies have errors or mistakes. What's it supposed to do? It basically negotiates an agreement that the policies were to apply as intended, and we're told that's unreasonable because what's their evidence? Is there any evidence anywhere after a million pages of document production, dozens of depositions, thousands of pages of transcripts, that Goulds ever intended to and sought to buy unaggregated primary coverage with products coverage? No. Goulds had no evidence. The broker had no evidence. Is there any evidence Utica ever agreed to sell such an unusual policy? No. Utica had no evidence. Goulds had no evidence. None of the other insurers had any evidence. The only thing Clearwater ever cites is the blanks on the policies. That's it. That's the sum total, and then a bunch of arguments that Utica had to get the loss under the umbrellas because that's where the reinsurance was. The standard. It would be a strange reading of the agreement that they bought coverage that they were never going to get to use because there were no aggregates. I mean, it would be an odd expense to explain to the investors that they spent all kinds of money on umbrella coverage when there was no aggregate that would ever be reached. Hundreds of millions of dollars of excess coverage over 30 years. Your Honor, if I can, Judge Cabranes, I am out of time, but I wanted to address the USF&G standard if I could briefly because that's what governs. The question to Clearwater's counsel was what happens if we agree there's no follow of the fortunes obligation? And at first there was an agreement that the issue below would be reasonableness. But that's not how it ended. Clearwater's position is that if there's no follow of the fortunes or follow of the settlements obligation inherent or implied or expressed, that they get to really litigate everything. We come below, and they get to challenge whether our policies have aggregate limits or not, and we have to somehow act as if they're Goulds and we're Utica and litigate a lost policies case. That's what they're saying. It's basically asking for a total, complete re-litigation of the underlying dispute with Goulds that we just finished settling. And if you go back to North River v. Ace and Travelers v. Gerling, a decision, Judge Wesley, you were on, that can't possibly be a proper policy in a situation like this to go re-litigate everything because the reinsurer wants to second-guess the settlement we made. The USF&G court, New York Court of Appeals decision, explained this standard in 2013, and it's important because it followed on and extended two landmark decisions from this court, North River v. Ace and Travelers v. Gerling. Reinsurers were challenging whether there's any deference owed to a seating company's allocation decisions, and this court found in North River and in Travelers that there was. That was still an open issue under New York law. And the New York Court of Appeals considered the issue and said, yes, there is deference owed. Well, there's definitely a difference between trying to choose between claims of putting all the emphasis or placing all the settlement on claims that are covered versus claims that are not covered. And, you know, that's the environmental cases. But you say this is different because here there is insurance. The question is whether there was a reasonable interpretation of the agreement. And from that, and the courts have said there's nothing wrong with the seating acting in some self-interest, as opposed to, of course, it's always measured in bad faith. A lot of those are bad faith cases. But the issue is, I take it in your view, is it's not so much whether there was or wasn't coverage, but whether your assessment of your chance of losing on the aggregate issue was such that there was a reason to settle and then resolve adding money to the cap, et cetera, et cetera. Well, in our view, the issue is, did we have a reasonable or plausible basis for settling on the terms we did? And that's the standard from USF&G. An important, very important point of USF&G, which is an extension and comes from what this court said in Travers v. Gerling, is all this effort to say, well, seating company, you allocated the way you did because you were trying to maximize reinsurance. This court dismissed that in Travers v. Gerling and said that they don't have to minimize the reinsurance to avoid a bad faith finding. In USF&G, the court said it's unimportant, it's not even an issue. And the only issue is, did we have a plausible basis for settling on the terms we did? Of course we did. The California courts absolutely affirmed what we did, not only as a reasonable or a plausible, they found there were aggregate limits in these policies. It can't be relitigated by a reinsurer. Mr. Snead, there are, of course, two appeals before us. Give us, in summary form, what decree do you want from us? If you were to succeed fully on your claims here, what is the disposition that this court would announce? We would ask the court to issue an order vacating the district court's decision on the cap issue, which came in November of 2014, as well as its denial of our motion to reconsider, to remand that issue for consideration of extrinsic evidence before the district court. How would that be? How would that be done? We, Your Honor, we had an expert testimony that we offered to the court, which it refused to consider. Would that be a bench trial of some kind, or is that a jury trial? What is that? What would happen in the district court? There would be discovery, perhaps, on how Clearwater has operated over the years under this language. That's what led... And this would be submitted to a trier of facts? Yes, and I'm sorry that, as I sit here, I can't recall, but I do believe there's a jury demand below. But there would be... I'm just trying to figure out, having had the benefit of your argument, what it is that you would accomplish here, you would have us accomplish for you. Vacate the cap. It costs us about $4 million. Send us back to litigate whether there really is a cap, because there is no... We say the contract is at least ambiguous. As far as the court's follow-the-settlements, follow-the-fortunes ruling affirmed that, the court properly found, as a matter of law, that under the standard in USF&G and Travelers Be Girling, Utica obviously had a reasonable, plausible basis for making the deal it did, and it's binding on this reinsurer. All right. Mr. Frederick, you reserved a little bit of time. Thank you. Let me start with your question, Judge Wesley, about why you would have umbrella if there were no aggregates, and that would be if there was an especially large verdict for the occurrence that would exceed $500,000, you'd have the umbrella policy to cover. The occurrence is individual or individual-specific. That's correct. So it would be completely rational to conduct insurance in that way. Let me go now to the allocation and the reasonableness question. We agree that USF&G is the governing standard, and I'm quite surprised that my colleague here has embraced that decision so clearly, because that case is almost directly on point. There, what the New York Court of Appeals held was that there was a triable issue of facts, summary judgment was not appropriate, where 100 percent of the allocated settlement had gone to the reinsured claims and 0 percent to the bad faith claims. If you substitute the idea for bad faith claims to primary insurance where there was an arguable issue, we think a quite substantial one, about there not being aggregate limits, you have exactly the same situation. So clearly there is an issue of fact that the district court erred in deciding on a summary judgment standard. That ought to be sent back. I would note that in the Fireman's Fund case, the Northern District of New York is now set for trial this very issue because the district court had denied summary judgment for the cedent's claim. So this issue, Judge Cabranes, is in fact going to go to trial in a separate case arising out of the exact same set of Gould's policies. Unless the court has any further questions, we'll submit. Thank you.